Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. Before we hear argument in the first case, we have a couple of housekeeping matters to take care of. Specifically, the cases of Lane v. United States, Goodall v. United States, and Stevens v. State of Arizona are submitted. The first case for argument today is Powers v. United States, and I believe Mr. Kaplan is up first. Thank you, Your Honor. Good morning. May it please the Court, my name is Daniel Kaplan. I'm here representing the appellant Philip Powers. Trial counsel Sarah Erlander is here at the counsel table. I will watch the clock and try to save about two minutes for my rebuttal time. How much are you trying to save? About two minutes. Okay, very well. Thank you. When you open up a treatise and look up the necessity defense, what you find are fact patterns essentially the same as what the undisputed facts in this case are. It's undisputed that at the time Philip acted as he did, he was deep, deep in a remote wilderness. He had no water. There was no one around. There was no prospect of rescue. He would not have survived another day, according to the undisputed testimony of the doctor who treated him, without rescue, without water, without treatment. And it's undisputed that one of the fires that he set for which he was prosecuted was what led to his being rescued and not dying that day. Mr. Kaplan, as you know, we are a court of review, and it's important that we determine what the standard of review is for the findings of the magistrate judge. Do we review his findings for clear error or de novo? Clear error. And what case or cases would you cite to that effect? The cases that I cited, the Bibbins case, is not very explicit about it, but it appears to be applying that standard directly, sort of skipping over the district court appeal and straight to the magistrate. And a case I cited from the Tenth Circuit was more explicit about it. I can look that up in just a moment, but that Tenth Circuit case was the one that laid that out pretty clearly, that it was the clearly erroneous standard for factual issues and de novo for legal issues. So everything we review in this case that was decided by the magistrate judge, we view it through the lens of clear error. Is that correct? Factual matters, yes. Factual, right. Exactly. Sure. And there's very little dispute on any factual matters here, as the magistrate judge observed, kind of unusual thing about this case. There were events that happened over two days, not a whole 48 hours, but started in the evening of one day and continued into the second day. And in that time period, Mr. Powers set three different fires. And the complaint included seven counts. So as we apply the law of the necessity defense, do we do it count by count? And for each of the separate events that occurred, does he need to demonstrate necessity for each of the fires? I would say yes with an asterisk. And what I mean by that is the necessity defense would have to be evaluated as to each charge and each fire. Yes. However, if the court were to separate out one of the three fires, and let's just say the first one, which the government has said is different from the other two, the first one, it was nighttime, Philip was not in quite as extreme, dangerous, life-threatening circumstances as he was the next day, and say, well, maybe it applies to the other two but not to this one, there would be implications for the major portion of the penalty, which is the financial penalty. Okay. So you're going right to what I was going to ask you next, which was, Tim, there was a stipulation, if I recall, between the parties with respect to the restitution order. And is it tied to any particular fire, or is it for all three of them? What was the agreement? I'll just give you the exact wording. It's not expressly tied to a particular fire. What it says is the recoverable fire suppression cost, which, as the court knows, related solely to the Sycamore fire, the second one. There were no costs related to the other two fires. Those are, and it says, and specifically the Sycamore fire. In the stipulation, that's what it says. Specifically the Sycamore fire are $293,000, et cetera. And then the next sentence says, more specifically, if and only if the United States prevails at trial, the parties stipulate the full restitution is that amount. So there's a specific reference to those being the cost for the Sycamore fire. And the phrase prevails at trial, arguably there's some ambiguity there, but in context it appears to be saying that's the restitution for the Sycamore fire. So if the necessity defense applies to the Sycamore fire, which is solely responsible for those costs being incurred, then that restitution penalty should be vacated. So you have argued in your brief that once the necessity defense applies and a person is faced between the choice of evils, there's really no requirement that the action they take be reasonable. That they could, whatever they needed to do to avoid one evil and illegal conduct is going to be protected by the necessity defense. But as I think about the cases that talk about that, it's a little troubling, because there's an example I think in the Shum case about somebody lost in the woods and they come upon a structure, a house, and they break in and they take provisions. And they need to do that to survive. But what if they decided, I'm cold, I need to survive, and they burned it down. And they just burned the cabin to the ground, when they could have broken in and warmed themselves inside. I mean, does that mean they're covered by the necessity defense, even though the action they took was more extreme than what was necessary? Well, I have to object to the first part of your question, which you were stating that I took the position that the actor does not need to be reasonable. And I apologize if I gave that impression in the briefs. I absolutely did not take that position. The action has to be reasonable. And there are cases in this Court that say that under all the justification defenses, which is a broader category that includes the necessity defense, the actor must behave reasonably. What I would say, however, is that there's a line to be drawn between being reasonable and being perfect or doing the least possible harm or damage. So the magistrate judge applied that latter type of standard, saying he could have done more. He could have dug a fire pit. He could have cleared out the brush. He could have done all these things, setting aside whether when he was that close to death and drinking his own urine and that desperate in those circumstances, he had the strength to do that and still have any chance of walking back, setting aside that question. If you really apply that standard of least possible harm, least possible danger, et cetera, you're going to whittle down the necessity defense to a point where it's essentially never available, because let alone whether people in any circumstances in normal life would be able to meet that standard, people in desperate circumstances, which essentially is integral to this defense that they are in those circumstances, they're never going to meet that standard. So certain actions are not covered by justification more broadly or necessity. So there was an example of two people go into a remote area and one of them realizes that the other is going to murder him in a month, and so they would be justified by necessity. They could steal the other person's car and leave, and they could do that at the outset of the trip. They don't have to wait for the whole month. But I don't understand the law to mean that they could kill the other person and claim necessity for doing that. So there are limits, you would agree. Absolutely, yes. Right, so you can't just take the most extreme action and then argue, well, it's protected by necessity. Sure, and the analogy here would be, and I'm going to try to reserve after this, but the analogy here would be if Phil said, oh, my gosh, I'm afraid I'm going to die here, I'm going to sprinkle kerosene over a two-acre area and then throw a match onto it, he would have crossed the line of reasonableness. He would. And he wouldn't be entitled to the defense. When he held one big lighter up to one dead tree and waited an hour and thought it was going out, he wasn't crossing that line of reasonableness. But I would like to reserve this point. Counsel, I know you want to save the balance of your time, but when you come back up, will you address the point that the magistrate judge found that your client's physical condition was in quotes moderate after hearing all the medical testimony? Yes. When you come back up, will you address how under the clear error standard you get around that problem? Yes, Your Honor. Okay, very well. All right. Let's now hear from the government, Mr. Stearns. Good morning, Your Honors. My name is Paul Stearns. I'm an assistant U.S. attorney from Flagstaff, Arizona, and here on behalf of the government, Your Honor. If I could just start with some basic facts from this case. It's actually not two days. It was actually three days, and that's important based on some of the arguments that the defendant raises. The defendant actually drove to the area of the hike on May 26th. He spent the night there, and he testified at trial that once he got there, he knew there would be no water. He started the hike on May 27th, and he intended to do essentially a one-day hike, although it's described in the document that he provided in this case, trial exhibit number 23, which is found at ER 641. It's described as a two-day hike that's fairly strenuous, and it also in that document describes how water could be an issue, and it also describes that sometimes the trail is hard to find, and it's important to have a topographical USGS map, which he did not. So in any event, he started this hike on May 27th, and again he said he knew that there would be no water once he arrived at the scene. The defendant also knew the weather conditions at the time, and the weather conditions were essentially very hot and dry, and he testified about that. Can I jump in? I would like to sort of understand sort of the limits of the government's position on this point that you're making. So let's say, for sake of argument, that Mr. Powers was completely irresponsible in how he set out and prepared for this hike. So that's a given. So then we move on to, and then he finds himself in this position where he's in a life-threatening situation, and we can argue about when or if that happened, but assume for the purpose of my question, he's at that point. What's the government's position, that because he was irresponsible in getting himself to that point, that too bad the necessity defense is never going to apply because of his own actions? Is that? Yes, Your Honor. I don't think it's a question of either you die, as the defense counsel says, or you essentially raise the necessity and try to start a signal fire. I think the answer is that you are held responsible for your actions, and the responsibility in this case is that he was charged with Class B misdemeanors for, among other things, leaving a fire and to let it spread beyond his control, counts two through four, violating fire restrictions, and the remaining counts essentially causing timber and grass to burn. So if we conclude, so I guess that's right, you've answered my question. If we conclude that he is irresponsible in getting himself to the point where he's got a life-threatening situation, that set the fire, whatever, but you're going to be responsible for it. Yes, he has to be responsible. I think when we look at the Bailey case, among others, I think it's important to look at the nature of the coercion, and when I talk about coercion, I'm not just talking about the defense of coercion. Of course, coercion is an affirmative defense as well, but we have to look at the nature of the coercion. Is the coercion human-caused, or is it a physical force beyond his control, which is typically something in nature? And in this case, because the defendant knew the conditions when he arrived, in fact, he testified that he spent about two days preparing for this hike. But doesn't the record also show that he thought he was on a different hike? No, Your Honor, I don't think it does. Three times in the record, first of all, Ms. Erlander at trial said, let's clear this up. And she had him establish that while he had provided the wrong document to the Forest Service officer who investigated that, and that was Officer O'Neill, he had provided the wrong hike, essentially, to him when he was investigating it. And that's Trial Exhibit 14, Your Honor. In reality, Ms. Erlander had him correct the fact that the hike he was actually on was the Taylor Cabin Loop, also the Dogee Trail. And she did that the first time. And then in cross-examination, I did it again. There's no question he was confused about what he said to Officer O'Neill. And, you know, that's essentially a paraphrase of his words. But then in redirect, one more time, and this is at ER 518, Mr. Powers said that he felt confident he was on the hike that he read about. And this also goes back to my original point, which is that the defendant arrived the day beforehand. He didn't just arrive there on the day and then start the hike. He was actually there the day beforehand. And, again, he testified that he knew it was hot. He knew it was dry. He knew it was in Stage 2 fire restrictions, which is one fire restriction short of a full forest closure. He knew there would be no water, and yet he only carried 116 ounces of water. Now, that sounds like a lot of water, but that's about 6.12 ounces of water per mile, assuming he went the most direct route on this hike, which was essentially published in his own book as 18.8 miles. Let me ask you this. You had cited the Supreme Court's case in Bailey. Let me just cite a piece of that. The Supreme Court said that the necessity defense is not available unless the defendant, and I'm quoting, demonstrates that given the imminence of the threat, violation of the relevant statute was his only reasonable alternative. Given that standard at the time that Powers set what we'll call the Sycamore and Sycamore 2 fires, what reasonable alternative did he have to lighting an illegal fire? Well, Your Honor, first of all, I'm glad you pointed that point out because it says reasonable. They're not simply legal. And so one of the options that he would have had is to build a fire ring. One of the options that he would have had was to dig a fire pit. Now, he had a lot of equipment with him. He had a machete. He had a Ka-Bar knife. And the testimony was that any one of those could have been used. These are things that the magistrate judge actually set out, right, five or six things that he could have done, right? Correct, Your Honor. And the government's position, I take it, is that that is the response under Bailey. He could have done any of those things. Therefore, the necessity defense doesn't fly here. Well, I think the necessity defense doesn't apply for a couple of reasons. At least those. Right. I mean, I think, Bailey, the strongest point is where does the coercion come from? Is it human cause or is it a physical force of nature? And, again, defense counsel in the reply brief says he can't turn off the sun and he can't make the creek flows. But he knew that it was dry and hot before he started. And he still hiked unprepared. And, again, it's not just the lack of water. He didn't bring a backup map. Exhibit 23, Trial Exhibit 23, talks about bringing a USGS topographical map. He didn't bring a backup map. He didn't bring a first aid kit on a nearly 19-mile hike in Stage 2 fire restrictions in the high desert. This is a dry area. This was essentially a timber box. So he took no actions to essentially constrain that fire. And one of the cases that I think both parties talk about that's only somewhat applicable here is the Launder case. In the Launder case, the facts are different. It was a hike, but the defendant was on a very, very short hike. And he got lost. But in that case, the defendant actually tried to contain the fires and he tried to put them out. And, of course, there's no facts supporting that the defendant walked away from the fire. In this case, the defendant walked away from the fire and he said it was still going when he walked away from it. But he thought it was going out, right? You were talking about the Sycamore fire, the second one that he set. When, as I recall his testimony, he said he stayed with it for about an hour, didn't think it was working as a signal, thought it was on its way out, and so he hiked on or he moved on. So is one of the things he could have done is stay with that fire or put that fire out before moving on? Yes, Your Honor. He could have stayed with the fire. He could have put it out. And, again, if we look at it count by count, and count one is the count 18 U.S.C. 1856, where he essentially left that fire while it was still burning. And his testimony was clear. He left it while it was still burning. He looked back. But, in any event, going back to the Launder case, what's interesting about the Launder case is that this court said that one of the things that was at issue was there were no fire restrictions. And the court said, in my view, was suggesting that the government should have charged Mr. Launder with the violation of a felony under 18 U.S.C. 1855, which we didn't, of course, do here. But they said if the Forest Service wanted to put in fire restrictions, they could have. And, in this case, they did. They essentially followed, you know, this court's suggestions and implemented not just stage one, which is the lowest stage of fire restrictions, but stage two restrictions. Again, the defendant knew this prior to starting the hike. He testified, again, that he spent about two days preparing for the hike. He knew that the area was in fire restrictions. He said that the fire restrictions were posted. In fact, it's in the record the fire restrictions are posted at a kiosk in the parking lot where he had parked the night before. Also on that kiosk was essentially some warnings that says, do you have enough food? Do you have enough water? So, again, we kind of look at what's the nature of the coercion. About a month ago, I came to court here, and I was dressed similar to what I am today. And it was hot. It was over 100 degrees. It was sunny. If I would have went out for a two-hour walk and my head got burned, which wouldn't be a surprise given how much hair I don't have, that would have been, strictly speaking, a physical force of nature, but it wouldn't have been beyond my control because I could have wore a hat. I could have wore a sunscreen. I could have covered up. I could have stayed in the shade. Or maybe it was just so bad that I shouldn't have been on the hike to begin with. So, again, it's human-caused coercion. It's not a physical force beyond his control, Your Honors. Okay. Your time is up. Let me ask my colleagues whether either has additional questions of the government. I think not. Thank you very much. Thank you, Your Honors. All right. Mr. Kaplan, if you'll answer my question when you come up first, okay? Yes, Your Honor. So you asked about the magistrate judge finding that his condition was moderate. And that was clearly erroneous because the magistrate judge's reasoning was Dr. Harden testified that when he, Dr. Harden, examined Phil, he found his condition moderate. But what's clear on the record and not disputed is between the time when he set the fires and when Dr. Harden examined him, he had been picked up by a helitack crew. He was given water by the helitack crew. He was taken out of the sun. He was put in an ambulance. And you have video, body cam video from the ambulance of him getting IV fluids in both arms in the ambulance. And he was obviously in a cool environment, out of the sun in the ambulance. And then he was taken to the emergency room. And when Officer O'Neill talked to him, he said, well, they've got a couple of liters in you. It'll be a whole new ballgame. Did the defense present any testimony from any medical testimony to establish what his condition would have been at the time he set the fires? Or are we just speculating based on what you've argued, that what his condition was when he reached the hospital and that he'd had some fluids? Well, there was no doctor there to examine him when he set the fires. But, I mean, the doctor was offering an opinion that in a certain amount of time he would have died in the forest, right? So could he not have offered an opinion about what his condition was when he was setting the fires? There was one question about when did the heat exhaustion start, something like that. And I think the doctor's answer was, I don't know. But it doesn't require speculation to say when the treatment that he gets in the hospital, in the emergency room and the hospital, is fluids and being out of the sun and being out of the heat, that him being in an ambulance getting fluids and being out of the sun and in the heat, being in a helicopter and being out of the sun and the heat and getting fluids, is making him better. And he said in the ambulance, I feel a lot better. Officer O'Neill said, it'll be a whole new ballgame when you get a couple liters in you. So it's far from speculation to say his condition when he set the fires was a lot worse than it was after all that treatment, the exact same treatment the hospital gave him when he was taken in.  Other questions? I would like to ask him one more question. So I asked you in the first part of your argument about the hypothetical of the hikers breaking into a cabin and taking provisions and what if they burned it down. And I don't think you answered that part of my question. I know you said that the person has to be reasonable. But under that hypothetical, would it be okay to say, I burned the cabin down because I needed fire to stay warm? It would be unreasonable. It would cross the line of reasonableness, as in the hypothetical I gave of, instead of holding up a big lighter to one dead tree, fell, sprayed kerosene over two acres and then threw a match on it. It would be unreasonable to take such a destructive action way beyond what is necessary to try to stay alive. Do you have any questions? Thank you both, counsel, for your arguments. Very helpful. The case just argued is submitted.
judges: SMITH, BADE, FORREST